**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

MICHAEL RANDEL, individually and derivatively on behalf of ALICE Gunshot Detection Solutions, Inc.; DIRECTED TRUST COMPANY FBO MICHAEL RANDEL IRA; and JGUNNAR INCOME LLC, a Georgia limited liability company,

Plaintiffs,

v.

JERRY BRADLEY JARRETT a/k/a BRAD JARRET, individually; ALICE GUNSHOT DETECTION SOLUTIONS, INC., a/k/a AGDS, INC., a Delaware corporation; ALICE GUNSHOT DETECTION SOLUTIONS LLC a/k/a ALICE GUNSHOT DS LLC, a Georgia limited liability company; DONNA JEAN KRAUSE, individually; DB CONSULTING OF ATLANTA LLC a/k/a DB CONSULTING LLC, a Georgia limited liability company; and ALICE CENTRAL CALL CENTER LLC, a Georgia limited liability company,

Defendants.

Civil Action No. ________

JURY TRIAL DEMANDED

**COMPLAINT**

Plaintiffs Michael Randel, individually and derivatively on behalf of ALICE Gunshot Detection Solutions, Inc.; Directed Trust Company FBO Michael Randel IRA; and JGUNNAR Income LLC, a Georgia limited liability company (collectively, "Plaintiffs"), hereby file this Complaint for Damages, Equitable Relief, and Jury Demand against Defendants Jerry Bradley Jarrett a/k/a Brad Jarret, ALICE Gunshot Detection Solutions, Inc. a/k/a AGDS, INC. ("AGDS" or the "Company"), a Delaware corporation, ALICE Gunshot Detection Solutions LLC a/k/a ALICE GDS LLC, Donna Jean Krause, DB Consulting of Atlanta LLC a/k/a DB Consulting LLC, and ALICE Central Call Center LLC (collectively, "Defendants").

## PRELIMINARY STATEMENT

1. This action arises from a calculated and brazen scheme by Defendants to defraud Plaintiffs out of more than $272,500 in investment capital and to deprive Randel of an additional $91,287.40 (principal amount) of loan proceeds. Defendants, led by Brad Jarrett, lured Plaintiffs into purchasing preferred stock and revenue share agreements in AGDS through a web of material misrepresentations about the company's revenue forecasts, business prospects, debt-free status, and intellectual property—none of which were true. In fact, the preferred stock that Plaintiffs agreed to purchase, and paid for, *did not actually exist*, because it was never authorized pursuant to AGDS's certificate of incorporation.

2. Upon receipt of Plaintiffs' funds, Defendants immediately diverted the investment and loan proceeds to their personal bank accounts, credit cards, and shell entities, treating the company as nothing more than a personal piggy bank.

3. Plaintiffs bring this action to hold Defendants accountable for their securities fraud, common law fraud, breach of contract, breach of the Investor Rights and Voting Agreements, breach of fiduciary duty, loan defaults, and other unlawful conduct, and to recover damages, rescission, disgorgement of ill-gotten gains, restitution, and equitable relief.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because this action arises under the federal securities laws, specifically Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

5. This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367, as those claims arise out of the same case or controversy as the federal securities claims and share a common nucleus of operative fact.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa. Defendant AGDS is incorporated in Delaware. A substantial part of the events giving rise to the claims occurred in connection with the formation, governance, and management of a Delaware corporation.

7. Personal jurisdiction over each Defendant is proper because each Defendant transacted business in, directed tortious conduct toward, and/or is subject to jurisdiction in this District by virtue of the forum-selection clauses in the Stock Purchase Agreements and the governance documents of a Delaware corporation, and/or 10 *Del. C.* § 3104. In addition, this Court has personal jurisdiction over AGDS because it is a Delaware corporation (*see* 10 *Del. C.* § 3111), and over Defendants Jarrett and Krause, who were at all relevant times, directors and offers of AGDS, a Delaware corporation (*see* 10 *Del. C.* § 3114).

**THE PARTIES**

8. Michael Randel ("Randel") is an individual residing in Cartersville, Georgia. Randel brings this action individually and derivatively on behalf of AGDS.

9. Directed Trust Company FBO Michael Randel IRA (the "IRA") is a self-directed individual retirement account held by custodian Directed Trust Company for the benefit of Michael Randel. The IRA was the purchaser of record under the IRA Stock Purchase Agreement and IRA Revenue Share Agreement (each as defined below).

10. JGUNNAR Income LLC ("JGUNNAR") is a Georgia limited liability company with its principal address in Cartersville, Georgia. Randel is JGUNNAR's President. JGUNNAR

was the purchaser of record under the JGUNNAR Stock Purchase Agreement and JGUNNAR Revenue Share Agreement (each as defined below).

11. Defendant AGDS is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Georgia. At all relevant times, AGDS purported to develop and market gunshot detection technology, products and services.

12. Defendant ALICE Gunshot Detection Solutions LLC, also known as Alice Gunshot DS LLC ("ALICE GDS LLC"), is a limited liability company organized under the laws of the State of Georgia. ALICE GDS LLC was purported to have been converted into AGDS under Delaware law.

13. Defendant Jerry Bradley Jarrett, also known as Brad Jarret ("Jarrett" or "Brad Jarrett"), is an individual residing in Woodstock, Georgia. At all relevant times, Jarrett served as an officer and director of AGDS and an officer and member of ALICE GDS LLC.

14. Defendant Donna Jean Krause ("Krause") is an individual residing in Kennesaw, Georgia, and previously residing in Woodstock, Georgia. At all relevant times, Krause served as an officer and director of AGDS and officer and member of ALICE GDS LLC.

15. Defendant DB Consulting of Atlanta LLC, also known as DB Consulting LLC ("DB Consulting"), is a Georgia limited liability company. DB Consulting is owned and controlled by Jarrett as Managing Member and Krause as Member.

16. Defendant ALICE Central Call Center LLC ("ALICE Call Center") is a Georgia limited liability company listing Donna J. Krause as Member.

17. Defendants Jarrett and Krause are collectively referred to herein as the "Individual Defendants." Defendants AGDS, ALICE GDS LLC, DB Consulting, and ALICE Call Center are collectively referred to herein as the "Entity Defendants." All Defendants acted in concert and as

agents, employees, partners, and/or co-conspirators of one another, and the acts of each Defendant were authorized, ratified, and/or adopted by each other Defendant.[1]

## GENERAL ALLEGATIONS AND STATEMENT OF FACTS

### A. Brad Jarrett's Background and Prior "Gunshot Detection" Companies

18. Since 2019, or perhaps earlier, Brad Jarrett has unsuccessfully attempted to develop a profitable business centered around a gunshot detection system that could be used for security purposes in enabling emergency response to an active shooter situation.

19. The following facts demonstrate that, by the time they met Randel in January of 2026, Brad Jarrett and the other Defendants understood that the gunshot detection business was not a viable business endeavor. Rather, by 2026, it was an artifice for fraud, including securities fraud.

#### 1) Active Guardian, Inc.

20. In 2019, Jarrett served as an officer and director of Active Guardian LLC, a Wisconsin limited liability company formed on April 22, 2019.

21. Active Guardian LLC filed a provision patent application No. 62/675,829 on May 24, 2018 with the United States Patent and Trademark Office ("USPTO").

22. On November 22, 2019, Active Guardian LLC converted from a Wisconsin limited liability company to a Delaware corporation, named Active Guardian, Inc. ("AGI").

23. On December 5, 2019, AGI filed a "Form D Notice of Exempt Offering of Securities" with the United States Securities and Exchange Commission. That Form D disclosed,

---

[1] Additionally, it is often difficult to identify one particular Defendant as Jarrett and/or Krause used the Entity Defendants as their own alter-egos and drafted documents poorly, to such an extent that the names of certain Entity Defendants are inconsistently used or used collectively.

among other things, that Brad Jarrett was an executive officer and director of AGI and that AGI had sold equity securities as of November 22, 2019 under a claimed Rule 506(b) exemption from registration. That Form D also represented that AGI had no revenues.

24. On May 24, 2019, "Active Guardian," as patent applicant, filed patent application no. 16/421,652 with the USPTO, seeking approval of a patent for a "Gunshot Detection System." That patent application was published on March 19, 2020 as Publication No. US 2020/0088832 A1.

25. That proposed patent has not been approved by the USPTO and no patent has been issued.

26. Active Guardian, Inc. is no longer operating and, upon information and belief, was never a profitable business.

**2) Active Guardian AI LLC**

27. On August 12, 2024, Brad Jarrett formed a new entity, Active Guardian AI LLC ("AGAI"), a Georgia limited liability company, of which Jarrett is sole member and manager.

28. AGAI's business exactly mirrored Active Guardian, Inc.'s business, namely the marketing of active gunshot detection technology and related services.

29. Four days earlier, on August 8, 2024, before the certificate of formation for Active Guardian AI LLC was actually filed, Jarrett executed an Asset Purchase Agreement (the "APA") on behalf of Active Guardian AI LLC, as seller. The buyer counterparty to that Asset Purchase Agreement was Liber8now, Inc.

30. Pursuant to the APA, AGAI agreed to sell all of its assets related to its gunshot detection business (the "Sale Assets") to Liber8now.

31. Upon information and belief, the Sale Assets that AGAI purported to sell to Liber8now in the APA (including rights to patents or patent applications and other intellectual property) were the very same assets owned by Active Guardian, Inc.

32. Approximately two months following his execution of the APA, Jarrett admitted in an email dated October 17, 2024 that the gunshot detection technology was flawed, and that the patent application was stalled due issued raised by the patent examiner. Jarrett's email states, in pertinent part:

> In addition to the issues below, there are 5 current push backs from the patent examiner that will need to be addressed before AGI can get the product to a patent position. If they don't, it will never be approved and in fact could be a product that could cost lives.
>
> AGI has a product with a major flaw. . . . The flaw being, it can be 'tricked' to announce a gunshot when there is none or can miss a gunshot. Because of this flaw, many different versions/revisions have been deployed under the AGI name with minimal resolution. However, due to pressure from AGI customers, the solution was 'throttled back' to prevent false positives. Because these actions were taken, it is possible a gunshot/active shooter event could be missed. This could potentially cost lives and/or injuries. It is my position; AGI needs to inform their current customers to immediately stop using the devices and then provide them with a replacement solution or ask them to return the devices for a refund.

**3) ALICE Gunshot Detection Solutions LLC**

33. Notwithstanding that Jarrett orchestrated the sale of all gunshot detection Sale Assets to Liber8now, and despite his admissions that the products did not work, Jarrett created yet another gunshot detection company as an artifice for fraud.

34. Specifically, on August 6, 2025, Jarrett caused ALICE GDS LLC to be formed as a Georgia limited liability company.

35. At this point in time, Jarrett was involved in a romantic relationship with Krause. Upon its formation, Donna Krause acted as registered agent for ALICE GDS LLC, and at all relevant times was an officer and director of ALICE GDS LLC and AGDS.

**B. Jarrett Fraudulently Induces Plaintiffs to Purchase Preferred Stock**

36. Randel was introduced to Jarrett in January 2026.

37. On or about January 5, 2026, Randel met with Jarrett for approximately two hours, during which time Jarrett made an "investor presentation," complete with a slide deck,[2] to Randel.

38. Jarrett explained that Defendants had created a multi-sensor device with physics-based shockwave detection, thermal verification, a 5-megapixel camera, and impact detection, which was designed to immediately detect gunshots and report it to a dedicated 24/7 "central call center" within seconds, which, in turn, would alert the authorities.

39. Jarrett further represented that Defendants had production in place with over 1,000 units ordered.

40. In fact, the presentation expressly forecasted that Defendants would have approximately 1,500 units sold between January and March 2026 and approximately 12,693 units sold in the first year for a "cash inflow" of approximately $19.1 million increasing to 156,850 units sold in the first five years for a profit of approximately $236.8 million.

41. Jarrett represented that Plaintiffs' investment would be used for "inventory & tooling to accelerate to 5k–10k [units]/mo. capacity"; "channel expansion: distributor MDF, certifications, field demos"; "product roadmap: firmware features, integrations, compliance"; "working capital buffer for leased direct sales"; "liability insurance coverage"; and "sales and marketing."

42. Jarrett further claimed that Defendants were close to closing a deal with FIFA, which would include devices being installed and providing services for the 2026 World Cup.

[2] By way of example of footnote 1, the slide deck presentations included references to "ALICE Central Call Center," "AGDS Alice Gunshot Detection Solutions," and "Assisted Response."

43. On or about January 8, 2026, Randel requested existing revenue figures, sales forecasts, and sales opportunities with at least 75% chance of closing in 2026.

44. Jarrett responded via email attaching an Excel spreadsheet, showing projected revenue for the calendar year of 2026 as $9,378,690, with specific companies and sales figures for each, along with the following message:

> Attached is our projected revenue, providing we get our funding in place soon and can hire the resources to execute. Please keep in mind, this isn't pie in the sky hope, we have been working on this for about a year and we have previous history with white label companies mentioned in the spreadsheet. We have previous relationships with them and they have approached us to doing [sic] a white label program, same as they had before. We don't have to knock on these doors.
>
> Another note on the white label with the mentioned vendors in the spreadsheet; The largest security show is every year in Las Vegas called ISC West. March 23-27, 2026 is this years [sic] show dates.[3] The mentioned vendors would like to announce their version of the product at this show. So time is of the essence to be able to provide them with production units by April of this year.
>
> Lastly, these projections DO NOT include FIFA program we are working on. So those numbers are excluded at this time.

45. Later that same day, Jarrett texted Randel that Defendants had "just got word we won the FIFA deal," going on to specify that he was meeting with over 200 of the security staff for FIFA, Atlanta Police Department, Georgia State Police, World Congress Center, Hartsfield Airport, and Mercedes-Benz stadium to discuss operations and implementation. On January 8, 2026, Jarrett had described FIFA in an email as a program "we are working on," yet the same day texted Randel that "we won the FIFA deal."

---

[3] Neither Jarrett nor any other representative of AGDS actually attended the ISC West trade show.

46. On or about January 9, 2026, Jarrett emailed Randel regarding his potential investment:

> [The] stock will be convertible preferred stock. Option to be on the board at time of purchase to be outlined in the charter for preferred stockholders.
>
> $100,000 for 4.00%. However, because now I am under the gun with a deadline for presentation and kickoff by the 21st with FIFA, I'm still willing to honor the end of the year deal and add an extra percentage point if signed by the 12th with funding.
>
> $200,000 for 8.00%. I am still willing to honor the end of the year deal and add an 2 extra [sic] percentage points if signed by the 12th with 1/2 deposit on execution and balance by 2/1/26.
>
> I do have two other investors I'm making the exact same offer too [sic]. So with your investment and their investment, I can expand the company to the level I need to to kick things in gear.
>
> We will still need to raise the additional to really solidify the company and expand the infrastructure to the level that's going to be needed to make the company $100 million company in 12 to 18 months. Have you spoken with the investment company you were telling me about last week? Any reaction from them?

47. Based on Jarrett's representations which were also confirmed and/or ratified by Krause, Plaintiffs agreed to invest $200,000 in exchange for 10% interest, issued as Convertible Preferred Stock.

**C. The Agreements to Purchase Securities**

48. On or about January 15, 2026, Randel, through the IRA, agreed to invest $100,000 to purchase 100,000 shares of Convertible Preferred Stock in AGDS at a price of $1.00 per share, pursuant to a Convertible Preferred Stock Purchase Agreement executed by Jarrett as CEO of ALICE GDS LLC (the "IRA Stock Purchase Agreement"). A true and correct copy of the IRA Stock Purchase Agreement is attached here as **Exhibit A**.

49. That same day, Randel, through JGUNNAR, also agreed to invest $100,000 to purchase 100,000 shares of Convertible Preferred Stock in AGDS at a price of $1.00 per share, pursuant to a Convertible Preferred Stock Purchase Agreement executed by Jarrett as CEO of ALICE GDS LLC (the "JGUNNAR Stock Purchase Agreement" and together with the IRA Stock Purchase Agreement, the "Stock Purchase Agreements"). A true and correct copy of the IRA Stock Purchase Agreement is attached here as **Exhibit B**.

50. The Stock Purchase Agreements state that the IRA and JGUNNAR are the respective purchasers, but both Agreements also show Randel individually as the actual holder of shares on the Capitalization Table. *See* Exhibits A and B, § 2.1.

51. The Stock Purchase Agreements also refer to ALICE GDS LLC, a Georgia LLC, as "the form and domicile of the of the [sic] Company prior to its Conversion to a Delaware corporation" and require the manager of ALICE GDS LLC to deliver to the IRA and JGUNNAR "a certificate certifying (i) the resolution of the managers and members of the LLC approving the Transaction Agreements and the transactions contemplated under the Transaction Agreements, and (ii) resolutions of the managers and members of the LLC approving the Certificate in the articles of conversion which convert the LLC to the Company." Exhibits A and B, § 5.11.

52. The Stock Purchase Agreements required that, on or before their closing, a Certificate of Incorporation (in the form of Exhibit B attached to the Stock Purchase Agreement) would be filed to form AGDS or convert ALICE GDS LLC to a Delaware corporation as contemplated in Section 5.11.

53. The Stock Purchase Agreements also warranted the following factual representations:

a. That ALICE GDS LLC's forecasted Gross Revenue for Fiscal Year 2026 was "in excess of $8,000,000.00." This representation was false. Defendants separately projected $9,378,690 in the Excel spreadsheet. The Company had no reasonable basis for projecting $8,000,000 in revenue. In fact, according to its bank statements, the Company had less than $35,000 of capital prior to Randal's investment, and therefore had no realistic prospect of manufacturing products to generate revenue.

b. That the Company had "successfully negotiated" the "FIFA ATLANTA" deal and would receive confirmation within 30 days. This representation was false. No such deal existed.

c. That the Company was "free of debt." This representation was false. Upon information and belief, the Company had existing liabilities at the time of the IRA's and JGUNNAR's purchases.

d. That there were no technical issues with the Company's products. This representation was false, as evidenced by Jarrett's admissions in his October 17, 2024 email that the product had a "major flaw" and "could potentially cost lives."

e. That there were no supply chain constraints affecting the Company's operations. This representation was false.

f. That all intellectual property was wholly owned by the Company and unencumbered. This representation was false. In reality, patent application 16/421,652 for a Gunshot Detection System was owned by AGI, and purportedly sold to Liber8now per the APA executed by Jarrett.

g. That Plaintiffs' investment proceeds would be used for product development and other general corporate purposes, including transaction costs, scheduled pre-Closing

costs, and "white label" commercial arrangement costs, and that proceeds "may not be used for dividends or other distributions to existing stockholders." This representation was false and immediately breached. As detailed below, the investment proceeds were used to pay credit cards debts and personal expenses of Jarrett and Krause.

h. That the IRA and JGUNNAR would receive Convertible Preferred Stock. This representation was false. As described below, the securities were offered and sold as Convertible Preferred Stock but issued as common stock, as the Certificate of Incorporation for ALICE Gunshot Detection Solutions, Inc. did not authorize the issuance of preferred stock.

54. Each of the foregoing representations was material to the IRA's and JGUNNAR's decisions to purchase.

55. The IRA and JGUNNAR relied on these representations, through Randel, in making their respective purchases of securities.

56. Each representation was false when made.

57. Defendants knew each representation was false, or made each representation with reckless disregard for its truth or falsity, with the intent to induce the IRA and JGUNNAR to purchase.

58. Randel made the following wire transfers to a Bank of America bank account (account x3281) in the name of ALICE GUNSHOT DETECTION SOLUTIONS LLC to fund the Stock Purchase Agreements: (a) $50,000 on January 15, 2026; (b) $50,000 on January 16, 2026; and (c) $100,000 on January 27, 2026.

59. In total, Plaintiffs invested at least $200,000 in the ALICE Gunshot enterprise—$100,000 through the IRA and $100,000 through JGUNNAR.

**D. Formation of ALICE Gunshot Detection Solutions, Inc.**

60. Despite that Section 5.11 of the Stock Purchase Agreements contemplated that ALICE Gunshot Detection Solutions LLC would be converted from a Georgia LLC into a Delaware corporation,[4] this is not what actually occurred.

61. Rather than file a certificate of conversion with the Delaware Department of State, Division of Corporations, a Certificate of Formation was filed for ALICE Gunshot Detection Solutions, Inc., thereby creating a new corporate entity.

62. The Certificate of Incorporation for AGDS provides that "The total number of shares which the corporation is authorized to issue is 2,000,000 shares of $0.0001 par value per share common voting stock." The Certificate of Incorporation does not authorize the issuance of the Convertible Preferred Stock which the Plaintiffs agreed to purchase.

63. Accordingly, the securities offered and sold to the Plaintiffs were never authorized by the governing formation documents, and *did not exist* as a matter of law.

64. Jarrett and the other participating Defendants engaged in securities fraud by selling the Plaintiffs securities that did not actually exist.

65. In addition, AGDS never registered with the Securities and Exchange Commission, nor did it file a Form D with the SEC in order to claim an exemption from registration relating to the sale of securities to Plaintiffs.

[4] Jarrett was presumably familiar with this conversion process due to his prior involvement with AGI, which was converted from a Wisconsin LLC into a Delaware corporation.

**E. The Revenue Share Agreements**

66. In February of 2026, after Jarrett and Krause had already spent most of Randal's $200,000 investment on their own personal expenses, they needed more money to fund their lifestyle.

67. Jarrett and Krause offered Randal an opportunity to enter into a Revenue Share Agreement, whereby Randal would pay $37,500 in exchange for 3% of the Company's future revenues.

68. Jarrett and Krause represented that the Company needed $37,500 for a production order. In reality, there was no production order.

69. On February 10, 2026, JGUNNAR entered into a Revenue Share Agreement (the "JGUNNAR Revenue Share Agreement") with the Company.

70. Krause executed the JGUNNAR Revenue Share Agreement on behalf of the Company as "Corp. Secretary."

71. Randal funded to $37,500 to the Company in February 2026 pursuant to that agreement.

72. In April 2026, Jarret represented to Randal in text messages that:

a. He had received production orders and that the Company would "definitely" need "1,000 units asap";

b. Representatives of the Company were in meetings with the Savannah Port Authority and that they were "excited about the product";

c. "[W]e get [sic] an outside evaluation for the company" by a valuation firm and that "they feel" the Company is worth "about $130 million to an investor, so I've got an

investor interested in putting in between three and 5 million, but his funds won't be available for a couple of weeks.";

d. "we are issuing the PO for production tomorrow so our products start showing up on [sic] 2 to 3 weeks and then we can start deploying that and then Monday we have meeting with the state of Georgia"

e. "Hey Michael, its [sic] already been a very busy day working on a 2000 unit order right now."

None of these statements were true. Rather, they were designed to induce Randal to invest additional funds which Jarrett and Krause could use for their own personal expenses.

73. The Defendants used false statements to induce Randal, through his IRA, to enter into another Revenue Share Agreement in April 2026 (the "<u>IRA Revenue Share Agreement</u>"), whereby Randal would pay $35,000 in exchange for an additional 2.5% of the Company's future revenues.

74. Krause executed the IRA Revenue Share Agreement on behalf of the Company as Chief Operating Officer.

75. Randal paid another $35,000 to the Company on April 20, 2026 pursuant to that agreement.

76. Copies of the JGUNNAR Revenue Share Agreement and IRA Revenue Share Agreement (the "<u>Revenue Share Agreements</u>") are attached hereto as **Exhibit C and Exhibit D**, respectively.

77. Each of the Revenue Share Agreements provide, *inter alia*, that:

a. "This Agreement grants the Investor a share of revenue from Defined Gross Sales. It is non-dilutive (does not reduce existing shareholders' ownership), but the

investment is secured by Company shares equal in value to the investment, held as collateral." Revenue Sale Agreements, § 1.

b. "This Agreement has no fixed term." Revenue Sale Agreements, § 5.

c. "Within 12 months after Closing, Investor may elect to convert their investment to a share interest at the Company valuation at the time of conversion and if company mutually agrees to do so."

78. The Revenue Share Agreements constitute "investment contracts" and therefore are "securities" for purposes of the claims alleged in this Complaint.

**F. The Promissory Note and Personal Guarantee**

79. In May 2026, Jarrett contacted Randel and advised that the Company needed a quick cash infusion to fund a production order.

80. On or about May 19, 2026, AGDS executed a Security Agreement ("Security Agreement") and Promissory Note (the "Note"), and on or about May 22, 2026, Randel funded the loan of $40,247.08. The Note provided for a 90-day term maturing on August 20, 2026, with a total payoff amount of $42,287.40 (the "Note Payoff Amount"), consisting of $40,247.08 principal and a $2,040.32 cash conversion fee. True and correct copies of the Security Agreement and Note are attached hereto as **Exhibit E**.

81. The loan proceeds were designated for a production order.

82. The Note was secured by the Company's inventory collateral, and a UCC-1 financing statement was duly filed to perfect Randel's security interest.

83. Jarrett personally guaranteed repayment of the Note pursuant to a guaranty agreement set forth in the Note and executed by Jarrett in his individual capacity (the "Guaranty").

84. On August 19, 2026—the day before the Note's maturity date—Randel sent Jarrett and Krause a written payment demand by email, reminding them that the loan was due.

85. Despite this demand, AGDS and Jarrett failed and refused to pay any amount due under the Note and Guaranty.

86. The Note provides for a penalty of 10% per month on outstanding principal, beginning five days after the August 20, 2026 Maturity Date.

**G. Jarrett and Krause Fraudulently Induce Plaintiff to Advance Additional Funds**

87. Towards the end of July 2026, Jarrett began frantically texting Randel indicating that he was unable to make payroll and the liability insurance was due to be cancelled unless he received an immediate influx of funds from Randel.

88. The alleged need for these funds was confirmed by Krause.

89. Randel agreed to and did loan $49,000 (the "Emergency Loan") to ADGS and/or ALICE GDS LLC, so that those alleged payroll and other immediate liabilities could be satisfied. Jarrett agreed that the Emergency Loan would be repaid. Randel would not have loaned the funds without the parties' agreement that the Emergency Loan would be repaid.

90. Within days after sending such funds, Randel learned of Defendants' improprieties and demanded Defendants not use and immediately return the Emergency Loan funds.

91. ADGS, ALICE GDS LLC, Jarrett, and Krause refused to return the Emergency Loan funds to Randel and, based upon information and belief, used the funds for their own personal gain.

**H. Immediate Diversion of Plaintiffs' Investment Funds**

92. Bank records reflect that Defendants began diverting Plaintiffs' investment funds on the very same day they were received.

93. On January 15, 2026—the same day the first $50,000 investment wire was deposited into the ALICE GDS LLC Bank of America account—the following disbursements were made from that account:

(a) $7,000 via Zelle to Brad Jarrett, designated for "credit card payment on Business MC";

(b) $5,000 via Zelle to Donna Krause, designated for "Loan payment";

(c) $1,000 via Zelle to DB Consulting of Atlanta LLC;

(d) $2,000 via Zelle to Brad Jarrett; and

(e) $16,050.39 for a credit card payment.

94. The next day, on January 16, 2026, the following disbursements were made from the ALICE GDS LLC Bank of America account:

(a) $10,000 to DB Consulting's Bank of America account number ending in 1979.

(b) $7,500 to Praktess LLC, a law firm in Wisconsin. These amounts were used to pay Jarrett's personal legal fees related to his personal defense of a lawsuit commenced in the Circuit Court for Waukesha County, Wisconsin by Doug Pierce, as plaintiff, against Jarrett and other defendants relating to Active Guardian, Inc.

(c) $14,479.34 to American Express to pay credit card debts of Donna Krause.

95. On January 20, 2025, another $5,000 was transferred to DB Consulting's Bank of America account number ending in 1979. Additional funds were transferred on January 20, 2026 and January 23, 2026 to pay credit card debts of Brad Jarrett.

96. On January 27, 2026—the same day $100,000 was received from Directed Trust Company—$23,000 was transferred from the ALICE GDS LLC account to DB Consulting's account.

97. February 2026 bank statements reveal continued transfers from the ALICE GDS LLC account to DB Consulting totaling $19,615. These funds were then used to pay personal expenses of Jarrett and Krause, including Chase and American Express credit card payments for "Jerry Jarrett" and "Donna Krause," insurance premiums, and personal bills.

98. In February 2026, the ALICE GDS LLC account transferred $10,000 to ALICE Call Center. Those funds were used to pay personal expenses, including payments to "Destiny Krause" and personal card payments for Donna Krause.

99. Donna Krause's personal American Express statements reflect purchases at Big Door Vineyards, Starbucks gift cards, restaurants, and other personal items—all paid through Company funds routed through DB Consulting accounts.

100. Jarrett's Capital One account records reflect a $50,000 "loan withdrawal to ALICE GDS" on August 20, 2026, evidencing a lack of separateness between Jarrett's personal finances and the Company.

101. None of these expenditures fell within the authorized purposes of product development and other general corporate purposes, including transaction costs, scheduled pre-Closing costs, and "white label" commercial arrangement costs. The expenditures therefore constituted disguised distributions and were not authorized uses of the investment proceeds.

102. The personal expenditures and related transfers constituted misappropriations, disguised distributions, and conversion of Plaintiffs' investment funds.

## I. Corporate Governance Abuse and Retaliatory Removal

103. Under the Voting Agreements, Randel was designated as the initial Series Seed Director at the January 2026 closing.

104. On July 21, 2026, the Board elected Randel Chairman of the Board.

105. Upon assuming his governance role, Randel began exercising oversight of Company operations and financial affairs—as was his right and fiduciary duty as Chairman and a director.

106. On August 10, 2026, the Company's own attorney, Joel Myers, advised Jarrett and Krause that terminating an executive officer without the Series Seed Director's affirmative vote "would likely violate" the Investor Rights Agreements, and that a 2-1 vote could expose the Company to "an injunction, specific performance, or damages."

107. In flagrant disregard of their attorney's warning and in violation of the Investor Rights Agreement, Jarrett and Krause purported to remove Randel as Chairman of the Board—twenty-two days after Randel's appointment—and remove other executives without proper board authorization and without the consent of the Series Seed Director.

108. In a September 1, 2026 email to another investor, Shannon Mitchell, Jarrett admitted that "Donna and I own 86% of the shares" and characterized Randel's legitimate governance efforts as a "takeover," stating that Randel "was only the Chairman for 17 days and the takeover started on Day 2 of his chairmanship." This admission confirms that Jarrett and Krause removed Randel not for cause, but to eliminate oversight of their fraudulent scheme.

## J. Pattern of Defrauding Other Investors and Creditors

109. Randel is not the only victim of Defendants' scheme. Shannon Mitchell, another investor, demanded repayment of her investment beginning in July and August of 2026 and was

told there was no timeline for repayment. Mitchell's communications reveal that Defendants made promises of a "$1 Billion" company trajectory while failing to return invested funds.

110. In emails during the same period, Jarrett acknowledged that the Company had "cash-flow constraints"—while simultaneously continuing to solicit and accept new investments from unsuspecting victims.

111. Creaxion Corporation, a marketing vendor, demanded payment of $20,000 in unpaid invoices as of August 2026. The Company's failure to pay its vendors while diverting investor funds to personal accounts further demonstrates that the enterprise was operated as a fraud.

112. Jarrett and Krause also made similar misrepresentations to other investors and creditors, including, but not limited to, Carlos Shephard and Nichole Simpson.

**K. Alter Ego, Commingling, and Lack of Corporate Formalities**

113. The Entity Defendants are the alter egos of Jarrett and Krause. No corporate formalities were observed. The entities were used interchangeably as personal funding vehicles for the Individual Defendants.

114. DB Consulting held 1,720,000 shares of AGDS. DB Consulting is owned and controlled by Jarrett (Managing Member) and Krause (Member). Company funds were routinely transferred to DB Consulting, which then paid the personal expenses of Jarrett and Krause, including credit card bills, personal insurance premiums, and personal purchases.

115. ALICE Call Center obtained an Employer Identification Number on or about October 28, 2025, with Donna J. Krause listed as Member. Company funds were diverted to ALICE Call Center and used for personal expenses.

116. Bank of America credit cards issued to "Alice Gunshot DS LLC" list "DONNA JEAN KRAUSE" as the cardholder, with the account addressed to 120 Three Branches Dr, Woodstock, Georgia 30188—further demonstrating the complete unity of identity between the Entity Defendants and the Individual Defendants.

117. Each Entity Defendant was inadequately capitalized, was formed or used to perpetuate fraud, was used as a conduit for the personal benefit of Jarrett and Krause, and observed no corporate formalities. Recognizing the separate legal existence of any Entity Defendant would sanction fraud and promote injustice.

118. Plaintiffs have been forced to retain undersigned counsel to prosecute this action and have agreed to pay all reasonable attorneys' fees and costs associated with doing so.

## CAUSES OF ACTION

### COUNT I
### Securities Fraud — Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 (17 C.F.R. § 240.10b-5)
***(Against AGDS, ALICE GDS LLC, Jarrett, and Krause)***

119. The IRA and JGUNNAR repeat and reallege Paragraphs 1 to 118 as though fully set forth herein.

120. In connection with the purchase and sale of securities—namely, the 200,000 shares offered and sold as Convertible Preferred Stock but issued as common stock, as well as the Revenue Share Agreements, purchased by the IRA and JGUNNAR— AGDS, ALICE GDS LLC, Jarrett, and Krause, directly and indirectly, by the use of means and instrumentalities of interstate commerce, and of the mails:

(a) employed devices, schemes, and artifices to defraud the IRA and JGUNNAR;

(b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c) engaged in acts, practices, and courses of business which operated as a fraud and deceit upon the IRA and JGUNNAR.

121. AGDS, ALICE GDS LLC, Jarrett, and Krause knowingly and intentionally, or with severe recklessness, engaged in sales of securities (Convertible Preferred Stock) which were not authorized by the Company's Certificate of Incorporation and therefore *did not exist*.

122. AGDS, ALICE GDS LLC, Jarrett, and Krause knowingly and intentionally, or with severe recklessness, made the following material misrepresentations and omissions to induce the IRA's and JGUNNAR's purchases: (i) that the Company's forecasted Gross Revenue for FY 2026 was "in excess of $8,000,000.00"; (ii) that the Company had "successfully negotiated" the FIFA deal; (iii) that the Company was "free of debt"; (iv) that there were no technical issues with the Company's products; (v) that there were no supply chain constraints; (vi) that all intellectual property was wholly owned and unencumbered; (vii) that the securities would be offered and sold as Convertible Preferred Stock but issued as common stock; (viii) that Plaintiffs' funds would not be used for dividends or other distributions to existing stockholders; and (ix) that Defendants had an existing client base.

123. AGDS, ALICE GDS LLC, Jarrett, and Krause knowingly and intentionally, or with severe recklessness, made material misrepresentations and omissions to induce the IRA and JGUNNAR to enter into the Revenue Share Agreements.

124. Each of these representations was false when made, and AGDS, ALICE GDS LLC, Jarrett, and Krause knew them to be false or acted with severe recklessness in making them. These

misrepresentations were made with scienter—i.e., with the intent to deceive, manipulate, or defraud the IRA and JGUNNAR, or with such severe recklessness as to constitute a strong inference of fraudulent intent.

125. AGDS, ALICE GDS LLC, Jarrett, and Krause's scienter is established by, among other things: (a) the immediate diversion of Plaintiffs' investment funds to personal accounts and personal expenses on the very same day the funds were received; (b) the systematic transfer of Company funds through DB Consulting and ALICE Call Center to pay the Individual Defendants' personal credit cards, personal insurance, and personal purchases; (c) Jarrett's admission that he and Krause "own 86% of the shares" and his characterization of Randel's governance oversight as a "takeover"; (d) Myers's warning that terminating executive officers without the Series Seed Director's vote would likely violate the Investor Rights Agreement; (e) the failure and refusal to issue Convertible Preferred Stock; and (f) Jarrett's prior admissions that the gunshot detection products had a "major flaw" and "could potentially cost lives."

126. The IRA and JGUNNAR reasonably relied on AGDS, ALICE GDS LLC, Jarrett, and Krause's material misrepresentations and omissions in making their respective purchases. Had the IRA and JGUNNAR known the truth, they would not have purchased the securities.

127. As a direct and proximate result of AGDS, ALICE GDS LLC, Jarrett, and Krause's violations of Section 10(b) and Rule 10b-5, the IRA and JGUNNAR have suffered damages in an amount to be proven at trial in excess of $272,500, plus interest, attorneys' fees and costs, and consequential damages.

128. Alternatively, with respect to the Individual Defendants, such individuals were officers and directors, and therefore were controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act, and are liable thereunder.

**COUNT II**
**Violation of Georgia Blue Sky Laws**
**(O.C.G.A. § 10-5-50(1)–(3))**
***(Against AGDS, ALICE GDS LLC, Jarrett, and Krause)***

129. The IRA and JGUNNAR repeat and reallege Paragraphs 1 to 128 as though fully set forth herein.

130. The securities at issue—shares offered and sold as Convertible Preferred Stock but issued as common stock in ALICE Gunshot Detection Solutions, Inc., as well as the Revenue Share Agreements—constitute "securities" within the meaning of the Georgia Securities Act of 2008, O.C.G.A. § 10-5-2(30).

131. O.C.G.A. § 10-5-50(1) provides that it is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly, to employ any device, scheme, or artifice to defraud.

132. O.C.G.A. § 10-5-50(2) provides that it is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly, to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading.

133. O.C.G.A. § 10-5-50(3) provides that it is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly, to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

134. AGDS, ALICE GDS LLC, Jarrett, and Krause, each of which lived or operated in the State of Georgia, violated each of O.C.G.A. § 10-5-50(1), (2), and (3) by making the material misrepresentations and omissions described herein to induce the IRA's and JGUNNAR's purchases, and by thereafter misappropriating the investment proceeds.

135. The Individual Defendants are jointly and severally liable as "control persons" of the Entity Defendants under O.C.G.A. § 10-5-58, and are also directly liable as persons who materially aided in the violations under O.C.G.A. § 10-5-58(c).

136. As a direct and proximate result of AGDS, ALICE GDS LLC, Jarrett, and Krause's violations of the Georgia Securities Act, the IRA and JGUNNAR have suffered damages in an amount to be proven at trial in excess of $272,500, plus interest, costs, and reasonable attorneys' fees as provided by O.C.G.A. § 10-5-58.

**COUNT III**
**Common Law Fraud**
***(Against AGDS, ALICE GDS LLC, Jarrett, and Krause)***

137. Plaintiffs repeat and reallege Paragraphs 1 to 136 as though fully set forth herein.

138. AGDS, ALICE GDS LLC, Jarrett, and Krause made false representations of material fact to the IRA and JGUNNAR and to Randel, including but not limited to the representations concerning revenue forecasts, the FIFA deal, the Company's debt-free status, the absence of technical and supply chain issues, the ownership of intellectual property, the existing client base, and the use of proceeds from Plaintiffs, as specifically described above.

139. AGDS, ALICE GDS LLC, Jarrett, and Krause knew these representations were false when made, or made them with reckless disregard for their truth or falsity.

140. AGDS, ALICE GDS LLC, Jarrett, and Krause made these false representations with the intent to induce the IRA and JGUNNAR to make their respective purchases and Randel to make additional loans to the Entity Defendants.

141. The IRA and JGUNNAR justifiably relied on Defendants' false representations in making their respective purchases, and Randel justifiably relied on those representations in making his loans.

142. The IRA's, JGUNNAR's, and Randel's reliance was reasonable under the circumstances, given the specificity of the representations and the AGDS, ALICE GDS LLC, Jarrett, and Krause's positions of authority and access to information.

143. As a direct and proximate result of AGDS, ALICE GDS LLC, Jarrett, and Krause's fraud, the IRA, JGUNNAR, and Randel have suffered damages in amounts to be proven at trial, and are entitled to punitive damages given the willful, wanton, and egregious nature of Defendants' conduct.

**COUNT IV**
**Breach of Contract — Stock Purchase Agreements**
***(Against AGDS and ALICE GDS LLC)***

144. The IRA and JGUNNAR repeat and reallege Paragraphs 1 to 143 as though fully set forth herein.

145. The IRA and JGUNNAR, as the respective purchasers, entered into the Stock Purchase Agreements with AGDS and/or ALICE GDS LLC. The IRA and JGUNNAR bring this claim as parties to those agreements. The Stock Purchase Agreements constitute valid, binding, and enforceable contracts.

146. The IRA and JGUNNAR fully performed their obligations under the Stock Purchase Agreements by tendering the purchase price of $1.00 per share for 200,000 total shares, constituting at least $200,000 in investment capital.

147. AGDS and ALICE GDS LLC breached the Stock Purchase Agreements by, among other things: (a) making false representations and warranties in the Disclosure Schedule (Exhibit C to the Stock Purchase Agreements) concerning revenue forecasts, debt-free status, the FIFA deal, product functionality, supply chain integrity, IP ownership, use of proceeds, nature of the stock being purchased, and existing client base; (b) diverting the investment proceeds to

unauthorized purposes, including personal expenses of the Individual Defendants, which fell outside the authorized corporate purposes and constituted disguised distributions; (c) failing to honor the Investor Rights Agreement, including the requirement for Series Seed Director approval before terminating executive officers; (d) removing Randel as Chairman of the Board in violation of the governing agreements; and (e) failing and refusing to issue the IRA and JGUNNAR their bargained-for Convertible Preferred Stock.

148. As a direct and proximate result of these breaches, the IRA and JGUNNAR have suffered damages in an amount to be proven at trial in excess of $200,000, plus interest, costs, and reasonable attorneys' fees.

**COUNT V**
**Breach of Contract — Promissory Note and Personal Guarantee**
***(Against AGDS and Jarrett)***

149. Randel repeats and realleges Paragraphs 1 to 148 as though fully set forth herein.

150. On May 19, 2026, AGDS executed a Promissory Note and, on or about May 22, 2026, Randel funded the loan of $40,247.08. The Note provided for a Note Payoff Amount of $42,287.40, consisting of $40,247.08 principal and a $2,040.32 cash conversion fee, and matured on August 20, 2026.

151. Jarrett personally guaranteed repayment of the Note.

152. Randel fully performed his obligations under the Note by advancing the loan proceeds.

153. On August 19, 2026, Randel sent Jarrett and Krause, individually and as directors of AGDS, a written payment demand by email, reminding them that the loan was due.

154. Despite demand, AGDS failed and refused to pay any amount due under the Note on or before the August 20, 2026 maturity date, and continues to refuse payment.

155. The Note provides for a penalty of 10% per month on outstanding principal, beginning five days after the August 20, 2026 Maturity Date.

156. AGDS and Jarrett, as guarantor, are jointly and severally liable for the Note Payoff Amount of $42,287.40, consisting of $40,247.08 principal and a $2,040.32 cash conversion fee, plus the penalty and all costs of collection, including reasonable attorneys' fees and costs.

**COUNT VI**
**Breach of Fiduciary Duty — Derivative Claim**
***(Against Jarrett and Krause)***

157. Randel repeats and realleges Paragraphs 1 to 156 as though fully set forth herein.

158. Randel brings this Count derivatively on behalf of ALICE Gunshot Detection Solutions, Inc.

159. At all relevant times, Jarrett and Krause served as directors and officers of AGDS. As officers and directors of AGDS, Jarrett and Krause owed fiduciary duties of loyalty, care, and good faith to the Company and its shareholders, including Randel.

160. Jarrett and Krause breached their fiduciary duties by, among other things: (a) diverting Company funds to their personal accounts and to entities they own and control (DB Consulting and ALICE Call Center); (b) using Company funds to pay personal credit card bills, personal insurance, restaurant bills, personal purchases at Big Door Vineyards, Starbucks gift cards, and other personal expenses; (c) commingling personal and Company assets; (d) making material misrepresentations to investors to induce investment; (e) failing to maintain any corporate formalities; (f) removing Randel as Chairman in retaliation for his exercise of governance oversight and in violation of the Investor Rights Agreement; (g) self-dealing by causing the Company to transact with DB Consulting and ALICE Call Center for the personal benefit of Jarrett and Krause; and (h) wasting corporate assets.

161. Demand upon the Board of AGDS to bring this action would be futile because: (a) Jarrett and Krause control the Board and 86% of the Company's shares (by Jarrett's own admission); (b) Jarrett and Krause are the wrongdoers who would be called upon to sue themselves; (c) Jarrett and Krause removed Randel as Chairman specifically to prevent oversight; and (d) the Board, as currently constituted, is incapable of exercising independent and disinterested business judgment with respect to the claims alleged herein.

162. As a direct and proximate result of these breaches of fiduciary duty, AGDS and its shareholders, including Randel, have suffered damages in an amount to be proven at trial and are entitled to their reasonable attorneys' fees, costs, and interest.

**COUNT VII**
**Alter Ego / Veil Piercing**
***(Against All Entity Defendants)***

163. Plaintiffs repeat and reallege Paragraphs 1 to 162 as though fully set forth herein.

164. At all relevant times, the Entity Defendants—AGDS, ALICE GDS LLC, DB Consulting, and ALICE Call Center—were the alter egos of one another and of Jarrett and Krause. There existed, and continues to exist, a complete unity of interest and ownership between the Individual Defendants and the Entity Defendants such that the separate personalities of the entities and the individuals no longer exist.

165. The following facts, among others, establish the alter ego relationship: (a) Company funds were routinely transferred to DB Consulting and ALICE Call Center and then disbursed for the personal expenses of Jarrett and Krause; (b) each entity used 120 Three Branches Dr, Woodstock, Georgia 30188 as an address; (c) Jarrett and Krause exercised complete dominion and control over all entities; (d) no corporate formalities were observed; (e) the entities were inadequately capitalized; (f) Company credit cards issued to Alice Gunshot DS LLC listed Krause

as cardholder; (g) DB Consulting held 100% of the common stock of ALICE GDS prior to Plaintiffs' investment; and (h) the entities were used interchangeably as conduits for the personal benefit of Jarrett and Krause.

166. Adherence to the fiction of the separate existence of any Entity Defendant as an entity distinct from the Individual Defendants and from each other Entity Defendant would sanction fraud and promote injustice.

167. Accordingly, the Court should disregard the corporate/LLC forms of each Entity Defendant and hold all Defendants jointly and severally liable for the claims alleged herein.

**COUNT VIII**
**Fraudulent Transfers**
***(Against All Defendants)***

168. Plaintiffs repeat and reallege Paragraphs 1 to 167 as though fully set forth herein.

169. Plaintiffs are creditors of AGDS and ALICE GDS LLC by virtue of the Stock Purchase Agreements and the torts alleged herein, and Randel is also a creditor by virtue of the Promissory Note.

170. Defendants transferred assets of AGDS and ALICE GDS LLC—including Plaintiffs' investment funds and other Company assets—to DB Consulting, ALICE Call Center, Jarrett, and Krause, without receiving reasonably equivalent value in exchange.

171. These transfers were made with the actual intent to hinder, delay, and defraud Plaintiffs and other creditors of the Company, in violation of the Delaware Uniform Fraudulent Transfer Act, 6 Del. C. §§ 1301–1311, and/or the Georgia Uniform Voidable Transactions Act, O.C.G.A. §§ 18-2-70 through 18-2-80.

172. Badges of fraud establishing actual intent include, without limitation: (a) the transfers were made to insiders—Jarrett, Krause, DB Consulting (owned by Jarrett and Krause),

and ALICE Call Center (controlled by Krause); (b) the transfers began on the same day Plaintiffs' funds were received; (c) the Company received no reasonably equivalent value for the transfers; (d) the Company was rendered insolvent by the transfers or was insolvent at the time of the transfers; (e) the transfers were concealed from Plaintiffs; and (f) Defendants continued to make transfers while acknowledging "cash-flow constraints."

173. In the alternative, the transfers were constructively fraudulent because they were made without receiving reasonably equivalent value in exchange at a time when the Company was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction, and/or the Company intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

174. Plaintiffs are entitled to avoidance of the fraudulent transfers, recovery of the transferred assets or their value, attachment or garnishment against the transferred assets, injunctive relief against further transfers, appointment of a receiver over the assets, and any other relief the Court deems appropriate under the applicable fraudulent transfer statutes.

**COUNT IX**
**Breach of Investor Rights Agreement and Voting Agreement**
***(Against AGDS, Jarrett, and Krause)***

175. Randel repeats and realleges Paragraphs 1 to 174 as though fully set forth herein.

176. In connection with Plaintiffs' investments, the parties executed Investor Rights Agreements and Voting Agreements (collectively, the "Governance Agreements"). The Governance Agreements are valid, binding, and enforceable contracts, separate and independent from the Stock Purchase Agreements.

177. The Voting Agreements expressly provide that the Board of Directors of AGDS shall be set and remain at three (3) directors: Brad Jarrett, Donna Krause, and one individual designated by the holders of a majority of the shares of Series Seed Preferred Stock (the "Series Seed Director"), who shall initially be Michael Randel.

178. Section 5.4(g) of each Investor Rights Agreement provides that the Company shall not "hire, terminate, or make a material change to the compensation of any executive officer" without Board approval that includes the affirmative vote of the Series Seed Director. This covenant constitutes a contractual veto right bargained-for by Randel as a condition of his investment.

179. On August 10, 2026, the Company's own attorney, Joel Myers, described "a meaningful argument that Michael has a contractual veto over terminating the CEO and CFO" and described remedies available to Randel as "an injunction before the removal takes effect, specific performance, declaratory relief, or damages."

180. In flagrant disregard of their attorney's advice and their contractual obligations, on August 12, 2026, Jarrett and Krause purported to remove Randel as Chairman without the affirmative vote of the Series Seed Director, in direct violation of Section 5.4(g) of the Investor Rights Agreements.

181. Jarrett and Krause further breached the Voting Agreements by undermining the contractually required three-member Board structure and Randel's designated investor seat, and by using their majority control to nullify the governance protections for which Randel bargained.

182. The Company cannot rely on its own failure to file the Amended and Restated Certificate of Incorporation—which it was contractually obligated to file—to defeat the governance rights for which Randel bargained and paid. The four Governance Agreements must

be construed together to implement the intended governance bargain, and the Company is estopped from invoking its own breach as a defense.

183. As a direct and proximate result of AGDS, Jarrett, and Krause's breaches of the Governance Agreements, Randel has suffered damages in an amount to be proven at trial, and Randel is entitled to specific performance, declaratory relief, and/or injunctive relief restoring his governance rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Michael Randel, individually and derivatively on behalf of ALICE Gunshot Detection Solutions, Inc., the IRA, and JGUNNAR, respectfully request that this Court enter judgment in their favor and against Defendants, jointly and severally, and grant the following relief:

A. Entry of judgment in favor of the Plaintiffs and against the Defendants on all Counts alleged in the Complaint;

B. An award of compensatory damages in an amount to be proven at trial, but not less than $363,787.40, consisting of $272,500 for the IRA's and JGUNNAR's losses on account of Defendants' securities fraud related to the Convertible Preferred Stock and Revenue Share Agreements, plus Randel's $49,000 Emergency Advance, plus the Note Payoff Amount of $42,287.40 for the unpaid Promissory Note (consisting of $40,247.08 principal and a $2,040.32 cash conversion fee) plus a penalty of 10% per month on outstanding principal, beginning five days after the August 20, 2026 Maturity Date, plus all additional consequential, incidental, and special damages;

C. Punitive damages in an amount sufficient to punish Defendants for their willful, wanton, malicious, and egregious conduct and to deter such conduct in the future;

D. Disgorgement of all profits, benefits, compensation, and other amounts obtained by Defendants as a result of their unlawful conduct;

E. Imposition of a constructive trust over all assets, funds, and property obtained by Defendants through the fraudulent transfers and misappropriation of Plaintiffs' investment funds and Company assets;

F. Avoidance and recovery of all fraudulent transfers made by or on behalf of the Entity Defendants to or for the benefit of the Individual Defendants, DB Consulting, and ALICE Call Center;

G. A declaratory judgment that the Entity Defendants are the alter egos of one another and of Jarrett and Krause, and that all Defendants are jointly and severally liable for the claims alleged herein;

H. Injunctive relief enjoining Defendants from transferring, dissipating, encumbering, or concealing any assets pending resolution of this action;

I. An accounting of all funds received from Plaintiffs and all disbursements of Company funds during the relevant period;

J. Appointment of a receiver over the Entity Defendants' assets, if necessary to prevent further dissipation;

K. Pre-judgment and post-judgment interest at the maximum rates allowed by law;

L. Reasonable attorneys' fees and costs of suit, as provided by contract, statute, and equity;

M. Specific performance and/or declaratory relief restoring Randel's governance rights under the Investor Rights Agreements and Voting Agreements, including Randel's position as the designated Series Seed Director;

N. Rescission of the Stock Purchase Agreements and Revenue Share Agreements and return of all investment proceeds paid by the IRA and JGUNNAR, totaling no less than $272,500, plus interest; and

O. Such other and further relief as the Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable in this action pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: October 20, 2026

Respectfully submitted,

**BURR & FORMAN LLP**

*/s/ J. Cory Falgowski*
J. Cory Falgowski (No. 4546)
222 Delaware Avenue, Suite 1030
Wilmington, DE 19801
Telephone: 302-830-2312
Email: jfalgowski@burr.com

*Counsel for Plaintiffs*